Hanley v. Poh

*Craig S. Boyd* and *Jeffrey R. Boyd,* for plaintiff.
*Mary C. Favinger,* for defendant Poh.
*Xavier Samuel Mayo,* defendant, did not participate.
*Jeffrey J. Howell,* guardian ad litem for the minor child.

LASH, *J.,* July 20, 2005—The matter before this court is a child custody dispute between plaintiff, Joan M. Hanley, a non-relative caregiver of the minor child, and defendant, Heather M. Poh, the natural mother. A custody trial was held before the Honorable Thomas G. Parisi on June 23, 25 and 27, 2003. At that time, the trial court also considered Poh's petition for allowance to relocate to Florida with the minor child. The trial court ruled that Hanley did not stand in loco parentis to the minor child, that Poh be awarded primary physical custody of the minor child in Florida, and that Hanley could have visits with the minor child during the summer and during school breaks.

On appeal, the Superior Court of Pennsylvania reversed and remanded, finding that Hanley had standing with the minor child on the basis of in loco parentis. The Superior Court also required additional analysis, or in lieu thereof, further proceedings, to supplement the record. Subsequently, the Superior Court entered a supersedeas order requiring the minor child to remain in Pennsylvania pending entry of a final custody order by Berks County Court. This matter was reassigned to this court, who scheduled and held trial on June 20 and 21, 2005.

The issue remains primary custody of the minor child, Sean Alexander Mayo.

## I. FINDINGS OF FACT

(1) Plaintiff, Joan M. Hanley, is an adult individual who currently resides at 3901 Reiff Place, Exeter Township, Berks County, Pennsylvania 19512.

(2) Defendant, Heather M. Poh, is an adult individual who currently resides at 311 46th Street, Bradenton, Florida 34209.

(3) Defendant, Xavier Samuel Mayo, is an adult individual whose last known address is 4331 53rd Street, Apartment 21, San Diego, California 92115.

(4) Poh and Mayo are the natural parents of the subject minor child, Sean Alexander Mayo, born February 15, 1992, as well as two other children, Xavier Mayo, born July 25, 1990, and Brieana Mayo, born April 7, 1993.

(5) Poh and Mayo separated when Poh obtained a protection from abuse order against Mayo around June of 1993. Mayo then moved to California and has not exercised any custody rights to the three minor children.

(6) Poh currently has sole physical custody of Xavier and Brieana and also resides with her fiance, Frankie Sanders. Sanders has partial custody of his son, DeAndre Sanders, age 11, whom he sees on weekends, and for an extended time during the summer.

(7) Hanley became involved with Sean through Deborah L. Fagley, Sean's godmother and the life partner of Hanley. The partners resided together from May of 1992 until Fagley's death on August 26, 2002.

(8) Poh and Fagley became acquainted when both worked at the YMCA and Fagley was Poh's direct supervisor.

(9) Through her employment there, Poh also became acquainted with Hanley, who was then the director of a summer camp operated by the YMCA for school-aged children.

(10) Fagley took a strong interest in helping Poh, who at the time was a single mother with two children, including Sean. Fagley recommended that Poh move into Beacon House, a non-profit organization providing assistance to unwed mothers.

(11) Sometime in 1993, while at Beacon House, Poh was relegated to full bed rest while pregnant with Brieana. Fagley offered to care for Sean during this period, which offer was accepted by Poh.

(12) Fagley continued to assist Poh in the care of Sean after the birth of Brieana, with Fagley's involvement increasing. Sometime in 1994, Sean began residing with Fagley.

(13) When Sean began residing with Fagley in 1994, Hanley also resided at the residence, as did Carol Patterson. Ms. Patterson remained in the house until 1998.

(14) Fagley assumed the primary custodial duties of Sean from 1994 through 2002, with Hanley's assistance. Poh had substantial contact with Sean, but was unable to care for Sean due to her matriculation at the Reading Area Community College and eventually Albright College. Through her education, Poh became a licensed practical nurse.

(15) During the period from 1994 through 2002, Fagley also periodically cared for Poh's other two children. Further, other third parties also cared for the other two children while Poh was fulfilling her educational commitments.

(16) Poh obtained her practical nurse license in 1996. Subsequently, Poh took courses to become a registered nurse but has, to date, not achieved this status.

(17) Poh obtained employment at the Manor Health Care in West Reading, where she worked until 1999.

(18) After working for a Head Start program at Northwest Junior High School in Reading for several months in 1999, Poh obtained employment with Nurses Available, an agency which provided temporary private duty nursing care.

(19) Poh worked for Nurses Available from 1999 until 2002.

(20) Meanwhile, Fagley continued with her employment with the YMCA, until 1998.

(21) Hanley, who has a bachelor's degree in early childhood education and a master's degree in special education, works for KenCrest Services as the Director of Services for Early Intervention, a program designed to provide in-home assistance for children from birth until the age of three years.

(22) Fagley and Hanley paid medical and dental expenses for Sean, who for some time had no health care insurance.

(23) Fagley and Hanley also purchased clothing for Sean.

(24) During Fagley and Hanley's care of Sean, Poh lived, among other places, in Exeter Township in homes on Butter Lane and Fox Run. When Sean reached school age, he attended schools in the Exeter School District, despite the fact that Fagley and Hanley resided in the Boyertown School District.

(25) Sean attended Lausch Elementary in Exeter Township for first grade, Jacksonwald Elementary in Exeter Township from second through fifth grades, and Reiffton Elementary in Exeter Township for sixth grade.

(26) Poh's involvement with Sean's schooling was limited until he attended fourth grade. At that time, the school district decided to address education issues with Poh only.

(27) Poh's involvement with Sean's extracurricular activities also was limited.

(28) Fagley and/or Hanley provided regular transportation to school for Sean.

(29) Sean attended family functions of the Fagley and Hanley families regularly.

(30) Sean celebrated holidays and birthdays with Fagley and Hanley regularly.

(31) Sean enjoyed a close and loving relationship with members of the Fagley and Hanley families.

(32) In 1998, Fagley was diagnosed with a rare lung disease. The following year she was diagnosed with breast cancer.

20

(33) Subsequently, Fagley could not work outside her home.

(34) Hanley cared for both Fagley and Sean during this time.

(35) Sometime in 2002, Poh advised Fagley of her intentions to build a home near Lake Wynonah in Schuylkill County, Pennsylvania, and begin living there with her three children.

(36) Upon learning of Poh's decision to relocate, Fagley approached Poh requesting that legal documents be signed transferring custody of Sean to Fagley. Poh refused to execute the documents.

(37) On August 21, 2002, Fagley and Hanley commenced the within action seeking custody of Sean.

(38) Fagley and Hanley also filed a petition for special relief requesting an emergency hearing to obtain a temporary custody order granting them custody. Said hearing was scheduled for August 26, 2002.

(39) On August 26, 2002, the date of the hearing, Fagley passed away. On that same day, Poh and Hanley reached an agreement, which was incorporated into a temporary order dated September 16, 2002, and which provided for Sean to be with Hanley Mondays and Tuesdays and every third weekend, and to be with Poh at all other times.

(40) On or about October 30, 2002, the court appointed Anthony M. Horney Jr., licensed clinical social worker, to conduct psychological evaluations of the parties, Sean, and any other people who the evaluator believed should be included.

(41) Mr. Horney conducted interviews with Poh, Hanley, Sean, Brieana and Xavier Mayo over a several

month period from November 6, 2002 through February 18, 2003. An MMPI-2 was administered to both Poh and Hanley. Mr. Horney administered the Bricklin Perceptual Scale to Sean. Mr. Horney then prepared a written child custody evaluation dated March 10, 2003, which was submitted to the court.

(42) On or about April 2, 2003, Poh filed a petition for allowance to relocate herself and Sean to the State of Florida.

(43) The petition to relocate was consolidated with the custody action, and trial was held before the Honorable Thomas J. Parisi on June 23, 25 and 27, 2003.

(44) On June 27, 2003, the trial court ordered that Poh have primary physical custody of Sean, with Hanley to have substantial visitation during summer vacations and at least one of the breaks during the school year. The specific times and dates were to be negotiated by the parties. A separate order setting forth the same general terms and conditions, with specific times, was entered on July 30, 2003.

(45) On July 14, 2003, Hanley filed an emergency petition for supersedeas requesting that Hanley be granted primary physical custody of Sean, permitting Sean to remain in Pennsylvania, pending resolution of the matter in the appellate courts.

(46) On July 22, 2003, the trial court denied plaintiff's emergency petition for supersedeas.

(47) On July 25, 2003, Hanley appealed to the Superior Court of Pennsylvania from the order entered on June 27, 2003.

(48) On July 28, 2003, the Pennsylvania Superior Court granted the supersedeas requested by Hanley, requiring Sean to remain a resident of Pennsylvania.

(49) The supersedeas remained in full force and effect until June 14, 2004, when the Pennsylvania Superior Court filed a memorandum decision which vacated the order of the trial court and remanded the case to the common pleas court, relinquishing jurisdiction. The court also declared the supersedeas to no longer be in effect.

(50) The Superior Court found that the trial court erred, as a matter of law, in determining that Hanley did not stand in loco parentis to Sean. Further, the matter was remanded for the preparation of a comprehensive opinion encompassing an analysis of the best interests of Sean.

(51) In response, the trial court, on June 25, 2004, entered a new temporary order, setting forth that Poh should have primary physical and legal custody of Sean. The court expressly granted Poh permission to relocate Sean's primary residence to Florida. Further, Hanley was awarded visitation at specified times.

(52) In response to the trial court's order, Hanley filed a new emergency petition for supersedeas. On June 29, 2004, the emergency petition was denied by the trial court.

(53) On the same date, June 29, 2004, Hanley appealed the order of June 25, 2004, to the Superior Court of Pennsylvania, also requesting an immediate supersedeas. The Superior Court responded by granting a new supersedeas order, also on the same date, June 29, 2004.

(54) On July 15, 2004, the Superior Order entered an order quashing Hanley's appeal as interlocutory. The order also specified that the "supersedeas order keeping

the child in Pennsylvania, entered by this court on June 29, 2004, shall remain in force pending entry of a final custody order and appeal therefrom."

(55) As stated, further proceedings at the common pleas level were necessary. However, the trial judge was transferred to the Criminal Division of the Berks County Court. Accordingly, by order of July 30, 2004, the case was reassigned to this court.

(56) A pretrial conference was scheduled by this court for August 26, 2004, at which time this court scheduled a trial for November 22, 2004.

(57) By agreement of counsel, the trial was postponed so the psychological evaluator, Anthony Horney Jr., could conduct additional evaluations and provide an update. The trial was to be rescheduled upon completion of the evaluations.

(58) A written supplemental evaluation, dated February 17, 2005, was submitted to counsel for the parties and this court. An additional pretrial conference was scheduled and held on April 21, 2005.

(59) On May 2, 2005, the court entered a pretrial conference disposition order scheduling trial for June 20 and 21, 2005. By separate order, on motion of Poh and over the objection of Hanley, the petition to appoint a guardian ad litem for Sean was granted. The court appointed Jeffrey J. Howell, Esquire, as guardian ad litem.

(60) Poh, who is now 31 years of age, plans to marry Sanders, who is the father of her unborn child.

(61) Poh's mother and stepfather live in Winter Haven, Florida. Her sister, Tracy, lives in Orlando, Florida.

(62) Poh's mother and stepfather send Sean birthday and Christmas cards.

(63) Poh presently works as a nurse at the Pines of Sarasota, a nursing home, where she earns $40,000 to $45,000 annually.

(64) Poh's work hours are 7 a.m. to 3:30 p.m. weekdays.

(65) Sanders is presently 29 years old.

(66) Formerly a professional baseball player, Sanders is now self-employed as a baseball coach and clinics instructor. He earns approximately $40,000 annually. His work hours vary seasonally and are flexible; however, he generally sets his work hours from 3 p.m. to 9 p.m. daily.

(67) Poh and Sanders live in a four bedroom house with Xavier and Brieana.

(68) Poh's other children attend Martha B. King Middle School, which Sean would attend if he moves to Florida.

(69) In January of 2005, Hanley, who is now 43 years old, moved from Boyertown to her current residence in Exeter Township, in order that Sean could continue his schooling in the Exeter School District. Hanley and Sean currently reside there.

(70) Presently, there is no other significant person in Hanley's life.

(71) Hanley continues to work for KenCrest Services. She has flexible hours and is permitted to work some days at home.

(72) Presently, Sean has finished the seventh grade. During the first and second quarter, he received B and C grades. His grades declined during the third quarter to Cs and one or two Ds.

(73) Presently, Sean participates in football conditioning three times weekly.

(74) Presently, Sean participates in cross country at his school.

(75) Sean also played in the Exeter Youth football league.

(76) Sean also plays in the Fleetwood summer league basketball.

(77) Sean also plays in the City-County league baseball.

(78) Sean continues contact with his best friend, Harrison Stengle, who still lives in the Boyertown area.

(79) Sean also developed friendships with several youngsters who resided near Poh in Exeter Township.

(80) Sean suffered from anxiety and an obsessive compulsive disorder, which was manifested at times by an unwillingness to eat and a fear of swallowing.

(81) Fagley and Hanley engaged Sean in counseling with Dr. Vincent Morrello from December of 2001 until August of 2002, when Poh terminated the services. Hanley subsequently retained Dr. Morrello a second time, who counseled Sean from October 2003 to early spring 2004, when Dr. Morrello then ended his private practice.

(82) Sean now receives counseling from Janice Natale.

(83) Sean talks to Xavier and Brieana by telephone approximately once every week or two.

(84) Sean refers to and introduces Hanley as his godmother.

(85) Sean loves both Poh and Hanley.

## II. DISCUSSION

In making a determination, this court reviewed the transcript of the original trial held June 23, 25 and 27, 2003, the memorandum opinion of the Honorable Thomas G. Parisi dated October 1, 2003, in support of his decision from that trial, and the memorandum opinion of the Superior Court filed June 14, 2004.

This court also considered the testimony provided by the parties, Mother's fiancé, Frankie Sanders Jr., Linda J. Stengle, the mother of Sean's best friend, Sean's brother, Xavier, also known as R.J., held in camera, and Anthony Horney, who provided testimony regarding the updated psychological evaluations.[1]

This case features several unique circumstances and problems. The natural mother, Heather M. Poh, had three children while still a teenager. Shortly after the birth of her youngest child, Brieana, she separated from the children's father, and he moved to San Diego, California, having no further association with her or the children. Left to fend for herself, as she had minimal assistance from her family, Poh looked for aid from friends, including Fagley, who generously provided all necessary assistance, including care of Sean, while Poh sought to improve her circumstances through schooling. Fagley

---

1. At the request of the parties, and the guardian ad litem, this court did not receive additional evidence through an in camera conference with Sean. Apparently, Sean adamantly opposed any further involvement, particularly regarding answering questions on where he wanted to reside. This court concurred and met with Sean informally for the sole purpose of getting to know him on a personal basis. This meeting was conducted outside the presence of counsel and the parties, and no court reporter was present.

was more than a friend to Poh, providing her the type of support that you would expect from a mother. Also involved was Fagley's life partner, Hanley, who, though not as close to Poh as Fagley, nevertheless was equally generous in caring for Sean, as well as the other two children when necessary.

Poh eventually laid a solid foundation for her future, achieving the status of a licensed practical nurse. Her personal life remained less settled for an extended period of time, but now appears to have stabilized through her relationship with Frankie Sanders. The couple are engaged and are expecting their first child together in late September 2005.

From 1994 through August 2002, Poh's status regarding Sean, for all practical purposes, was that of a partial custodian. While she was involved with Sean and his care, to a large extent, the interaction was sporadic, and on an as-needed basis.

In 2002, Poh moved to change the status quo and assert her standing as mother by advising Fagley of her intention to move to Schuylkill County with all her children. By this time, Fagley, Hanley and Sean had developed into a family unit, and Fagley sought to obtain custody of Sean through legal process. When Poh would not agree to a transfer of custody, the within action was filed.

Circumstances quickly changed when Fagley passed away on August 26, 2002, the same day as a scheduled proceeding on Fagley and Hanley's petition for immediate temporary custody. At that time, discussions were held and an agreement was reached temporarily transferring custody to Poh, with Hanley to have partial cus-

tody on Mondays and Tuesdays and every third weekend.

The matter became more complex when Poh decided to move to Florida, filing a petition with the court to allow her to relocate herself and Sean. Poh's relationship with Frankie Sanders had become serious. Sanders had recently retired as a professional baseball player and had taken up residence in his home state of Florida. While Poh wanted to remain in Pennsylvania, she was not able to convince Sanders to do so. Sanders sought to continue with a career as a baseball instructor and saw no future for himself in Pennsylvania.

After trial in June 2003, the trial court awarded Poh primary custody, also permitting her to relocate to Florida with Sean. However, Sean was unable to relocate because Hanley obtained a supersedeas from the Superior Court requiring Sean to continue to reside in Pennsylvania. Poh technically retained primary custody of Sean, but as a practical matter was unable to exercise her rights when she chose to move to Florida, doing so the day after trial. Poh recognized that the move would result in a continuing separation between her and Sean, but she was committed to moving to Florida to establish her residence with Frankie Sanders. The separation was viewed as temporary, pending disposition of Hanley's appeal to the Superior Court. However, to date, Sean never moved to Florida, as the Superior Court remanded the case to common pleas for further proceedings, which eventually resulted in a separate ruling from the trial judge awarding Poh primary custody, and a second supersedeas from the Superior Court requiring Sean to remain in Pennsylvania. Sean has continued to reside with Hanley, attending the Exeter School District, and has visited Poh

and his siblings through an informal arrangement between Poh and Hanley, pending disposition of this case.

These unique circumstances result in two women fighting over one child, both of whom have a vested interest in the child, but who approach the issue from very different perspectives. The matter commenced from Poh's decision to turn over care of her child to Fagley. The argument can be made that her decision was responsible and even sacrificial, to enable her to dig herself out of the hole of being a single mother with three children and no prospects. By finding an excellent caretaker such as Fagley, who was willing to provide all necessary assistance, Poh and her children were able to survive, and Sean was given excellent care. An argument can also be made, however, that Poh abrogated her responsibilities to Fagley and Hanley. Her contacts with Sean over the years were sporadic. She could have invested more of her time and could have moved to resume full custody of Sean prior to 2002.

Hanley, on the other hand, first, in conjunction with Fagley, and later on her own, provided consistent and exceptional care of Sean, doing so unconditionally. It is clear that she has developed a great love for Sean, considering him to be part of her family. He is, in essence, her surrogate son. The loss of Fagley only increases her need to continue as Sean's caretaker.

These unique circumstances impose, without question, a substantial impact on Sean. First, Sean was abandoned by his father at a young age. As a result, he has had no father figure in his life whatsoever until the recent introduction of Frankie Sanders. Unfortunately, Sanders' contact with Sean has been minimal, due to the geographic circumstances. Secondly, Sean suffered extensively

through the death of Deborah Fagley. Fagley was the person most responsible for Sean's upbringing. The love between the two was substantial. The timing of Fagley's death was also critical, occurring on the same day as the first hearing on the court action, resulting in Sean moving into his mother's house.

Sean has developed an obsessive compulsive disorder. For a time, he was scared to swallow food. He refused to eat certain foods at all and manifested other obsessive symptoms. His behavior in school has been uneven. The court action has had a significant and adverse effect on him. His desires are to have the matter resolved as quickly as possible and to attempt to please both sides by remaining neutral. While all commentators have remarked that Sean is a well-behaved, young man with great potential, it is clear also that he is troubled.

As stated, Anthony M. Horney Jr. was appointed by the court to conduct a psychological evaluation and was later called upon to update that evaluation. He interviewed the parties and Poh's three children. He administered the MMPI-2 to the parties and the Bricklin Perceptual Scale to Sean. In the within evaluation, dated March 10, 2003, Mr. Horney provided background, then discussed the results of the testing. He concluded that Poh attempted to present herself in an overly favorable light and that, therefore, the results of the testing on her personality could not be considered reliable. Hanley's validity scale scores were moderately high, which Mr. Horney concludes is common to child custody evaluations and is not significant. Regarding Sean, Mr. Horney believes that Sean attempted to control the results of the Bricklin test such that Sean's rating of the parties would

be even. This demonstrates that Sean was motivated to present both caregivers as "good people."

Mr. Horney provided the following general observations:

"Sean loves both women (Heather and Joan). Perceptually, he expressed that he is feeling the pressure of having to make a decision about his loyalty to both individuals. It is important for Sean to establish his biological identity with his mother and family. It is also imperative that Sean is provided the most appropriate living arrangement to be healthy. Sean was fortunate to have Debbie Fegley [sic] and Joan Hanley serve as caregivers. Their modeling behavior assisted Sean in developing confidence, self-respect, and respect of others, in addition to having a solid work ethic.

"Sean requires appropriate and healthy interaction from both individuals. Sean perceives both Heather and Joan in the stereotypical sense of mother. Unfortunately, Joan and Heather view each other as a maternal threat. Joan and Heather will need to work collaboratively with each other for the well-being of this child. Sean is a very intuitive and sensitive child, and he has shared with me consistently that his comfort zone rests with both ladies. . . . In the event Sean perceives these two ladies working collaboratively, his anxiety level has and will decrease.

"Sean has experienced the loss of a significant loved one (Debbie Fegley) [sic]. Debbie was also viewed in the role as a mother. Sean consistently becomes teary-eyed and stressed when he speaks of Debbie. Any further perceived loss would be devastating for this child. . . .

"I was concerned regarding Heather's exhibited affect during our interview as it pertained to Ms. Debbie

Fegley [sic]. Heather exhibited a significant degree of hostility when speaking of Ms. Debbie Fegley [sic]. Ms. Poh shared that Ms. Fegley [sic] had provided support for Heather and her children when she was in need of support and guidance. In fact, Ms. Poh requested Ms. Fegley [sic] to be the godmother to her son. When speaking of Debbie's untimely demise, Heather appeared unaffected. Heather stated that Sean 'misses Debbie,' but did not elaborate as to the degree of suffering the child had, and is experiencing. (When I speak with Sean, he still becomes tearful when speaking of Ms. Fegley [sic].)

"Another concern that comes to light is the fact that Heather obviously had felt comfortable with Joan's level of care. The relationship faltered when Debbie had initiated the custody situation. It is in question if this situation would be at hand if Debbie had never initiated the custody request.

"Joan appears to have the maturity and insight in dealing with a stressful situation. An area of concern would be Heather's ability to deal with adversity when raising three children at one time. Debbie and Joan at one time were a valuable resource for Heather. Due to the existing events, it appears that this support system is in jeopardy. This is unfortunate due to the many benefits Heather and her children gained from being associated with Debbie and Joan.

"Heather Poh does not possess the basic familiarity with her son Sean. During my interaction with Ms. Poh related to the Bricklin parent questions, Ms. Poh was unable to name Sean's best friend or recall his favorite meal (meatballs and spaghetti), favorite snack (donuts) or Sean's best friend. Without hesitation, Joan Hanley

was able to recall all three variables to the letter. Joan Hanley has served in the role of a consistent custodial caregiver. She is aware of Sean's everyday routine (medical/emotional/educational). Sean is a respectful young man who is well-groomed and cordial. These are behaviors learned by children through repetition, structure, encouragement, as well as appropriate adult modeling behavior. Joan Hanley and the late Debbie Fegley [sic] served as the most consistent role models during Sean's impressionable developmental years."

Mr. Horney then concludes:

"(1) Heather Poh does not appear to be as familiar with Sean. Ms. Poh elected to have Sean receive custodial care from Debbie Fegley [sic] and Joan Hanley. Ms. Poh has not parented Sean on a consistent basis. Ms. Poh's absence from Sean's life has placed her in the role of 'older sister' than a true parental figure. From a parental standpoint, Ms. Poh would be rated below average due to lack of [sic] child's interests and consistency. In regard to the living arrangement and nurturance, Sean would be required to share or compromise attention. Ms. Poh obviously is more in tune to the needs of her other children (R.J. and Brianna) [sic]. This evaluator questions Ms. Poh's level of attentiveness to Sean due to the loss of Ms. Fegley [sic] and the transitional decompensating that are taking place in the school setting.

"(2) Heather stated that Sean was not close to Joan Hanley. This is very far from the truth. In fact, during the collateral interview with her two children, it was apparent that Ms. Poh did not utilize sound judgment and boundaries when making statements pertaining to Joan Hanley as reported by her son, R.J."

As a result, Mr. Horney made the following recommendations:

"(1) Joan Hanley and Heather Poh share legal custody of Sean Mayo. Sean's physical custody should be maintained with Joan Hanley.

"(2) Heather Poh is more suitable to have visitation during the week and every other weekend visitation.

"(3) Sean should receive outpatient counseling to address his personal loss of Debbie Fegley [sic], in addition to providing the child a safe haven for the future transition of the case. Sean is experiencing a degree of adjustment issues associated with anxiety and mild depression.

"(4) Both women should be ordered to attend 'Children in the Middle,' to obtain an increased understanding of a child's feelings, behaviors and perceptions when they experience separation, divorce and loss."

Due to the lapse of time from the previous trial, this court ordered Mr. Horney to submit an updated evaluation. He met again with Hanley, Poh, Sean and his two siblings. He also got to meet with Frankie Sanders.

In many respects, the updated evaluation mirrored Mr. Horney's conclusions from the first evaluation. However, he noticed a deterioration in Sean's presentation, stating: "Sean stated and presented as a young man experiencing a significant amount of pressure due to the existing custody situation. Sean's effect was contradicted and sad; he became labile, and disclosed the situation was exacerbating his anxiety and stress level." Mr. Horney interpreted Sean's presentation to reflect that Poh continues to have poor familiarity with Sean, that he is unable to openly present his feelings, thoughts and opin-

ions and views to Poh due to her perceived level of anger, that she has not validated her son's feelings regarding this process. He also noted that Sean experiences strong insight and a sense of security from Hanley, perceiving Hanley to be a competent caregiver. He receives a strong sense of guidance, supportiveness, confidence and admiration from Hanley.

Mr. Horney made the following general conclusions:

"(1) Joan Hanley and Heather Poh have had shared legal custody of Sean Mayo. History reflects conflicts with opinions regarding mental health treatment. Also, Heather Poh has not had any contact with present school personnel or Sean's current outpatient therapist. Joan Hanley has coordinated all the custodial responsibilities associated with being a parent acting in the best interest of a child. Quite frankly, Sean Mayo's huge successes thus far (*i.e.,* academia, sports, peer associates, respect of authority) are a result of the time and effort put forth by Joan Hanley.

"(2) Sean Mayo perceives a significant amount of pressure from Heather Poh, as well as his siblings, R.J., and Brianna [sic]. Sean's perception of his mother does not possess the qualities of empathy and compassion. Sean Mayo speaks matter of fact when speaking of his mother. His affect becomes blunted and distant as well. Sean also perceives that his mother is easily angered when her needs are not met as it pertains to the custody situation.

"(3) Sean Mayo has *never* voluntarily mentioned or discussed Mr. Frankie Sanders.

"(4) Sean Mayo is a polite, respectful and intelligent young man. He is goal oriented with aspirations of attending college and pursuing a future in sports. It is dif-

ficult to fathom an uprooting of this child who presently is on the track for success.

"(5) Children learn what they live and live what they learn. Joan Hanley has broken a number of barriers (*i.e.,* cultural, single parent, working single parent) and modeled behavior which has benefited Sean Mayo in is [sic] present living situation, in addition to planting seeds of motivation, desire, and caring for Sean Mayo's future endeavors.

"(6) When speaking to R.J. and Brianna [sic], they report conflicting information regarding the relationship between their mother (Heather Poh) and Joan Hanley. They also are unsure of the relationship Sean has with Ms. Hanley. If in fact Sean speaks with them as openly as they disclosed, they would be well aware of their brother's perceptions, needs and desires. R.J. and Brianna [sic] are also 'in the middle' of this situation. Brianna [sic] disclosed she didn't want to make a bad impression. The question is on whom would she be making the bad impression."

Mr. Horney made the following recommendations in his written evaluation:

"(1) Joan Hanley be assigned primary legal custody of Sean Mayo. Sean Mayo's physical custody remain with Joan Hanley in Pennsylvania.

"(2) Heather Poh is suited for visitation on a quarterly basis. Holiday vacation should be equally divided. Sean Mayo should be permitted to spend a two-week period of time for his summer vacation. The summer schedule should be worked around Sean Mayo's summer schedule.

"(3) Sean Mayo continue his outpatient sessions and follow all recommendations of his attending clinician.

Both Joan Hanley and Ms. Heather Poh should be included in this process."

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

This court must first decide whether, in determining Sean's best interest, the court should employ the analysis set forth in *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990), due to Poh's relocation to Florida. In *Gruber,* the Superior Court established a standard to be utilized when the custodial party moves to a new residence a substantial distance from the other party. Unlike this case, however, *Gruber* and its progeny involve custodial disputes between parents.

Where the custody dispute is between a parent and a third party, the legal standard of proof is different than when between parents, with the evidentiary scale being tipped and tipped hard in favor of the biological parent. In such instances, the biological parent has a prima facie right to custody,[2] which will be forfeited only if con-

---

2. This is still the law, although a plurality opinion of the Pennsylvania Supreme Court ruled otherwise. In the case of *B.A. v. E.E. ex rel. C.E.,* 559 Pa. 545, 549 n.1, 741 A.2d 1227, 1229 n.1 (1999), the following footnote appears:

"In *Rowles v. Rowles,* 542 Pa. 443, 668 A.2d 126 (1995) a plurality of this court would have abandoned the presumption that parents have a right to custody of their children as against third parties. In its place,

vincing reasons appear that the child's best interests will be served by an award to the third party. *Charles v. Stehlik,* 560 Pa. 334, 744 A.2d 1255, 1258 (2000). While *Gruber* incorporates a burden of production, it does so only in cases where a custodial order exists prior to the relocation and is limited to the initial burden of the custodial parent to show that the move "is likely to significantly improve the quality of life for that parent and the children. In addition, each parent has the burden of establishing the integrity of his or her motives in either desiring to move or seeking to prevent it. The custodial parent must convince the court that the move is not sought for whimsical or vindictive reasons. Likewise, the noncustodial parent must show that the resistance to the move

the plurality suggested 'weighing parenthood as a strong factor for consideration.' [542 Pa. at 448] 668 A.2d at 128. In suggesting this change in terminology from 'presumption' to 'weighing parenthood as a strong factor,' however, the plurality observed:

"In *Ellerbe [v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980)], both opinions, representing all seven justices, agreed on several principles: 'the parent-child relationship should be considered to be of importance in determining which custody arrangement is in the child's best interest,' 'special weight' and 'deference' should be accorded the parent-child relationship, and the relationship should not be disturbed 'without some showing of harm' or unless circumstances 'clearly indicate the appropriateness of awarding custody to a non-parent.' *Id.,* 490 Pa. at 366, 369, 370, 373, 416 A.2d at 513, 514, 515, 516-17. *We adhere to these principles,* for, in general, parents have a deep, abiding commitment to the well-being of their children.

"[542 Pa. at 448] 668 A.2d at 128. (emphasis added) Because the *Rowles* opinion did not command a majority of the court, the presumption that parents have a right to the custody of their children as against third parties remains in effect. Whether the parents' interest in their children is referred to as a presumption or as a factor to be weighed, however, the main idea is that parents are to receive special consideration: as the court put it in *Ellerbe,* special weight and deference should be accorded the parent-child relationship."

stems from concern for the children and his or her relationship to them." *Gruber,* 400 Pa. Super. at 186, 583 A.2d at 440.

Simply put, if Hanley establishes convincing reasons for this court to award her custody, she would prevail and there would be no need for a *Gruber* analysis. On the other hand, if Hanley fails to meet her burden, primary custody must be awarded to Poh. Thus, due to the standard of proof required in third-party cases, a *Gruber* analysis is not triggered by Poh's relocation to Florida.

Further, for the sake of argument, if this court were to employ a *Gruber* analysis, we find that her relocation would not preclude Poh from an award of primary custody. Under *Gruber,* the court must consider these factors:

"(1) The potential advantages of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a monetary (sic) whim on the part of the custodial parent;

"(2) The integrity of the motives of both the custodial and noncustodial parent in either seeking the move or seeking to prevent it; and

"(3) The availability of realistic, substitute visitation arrangements which will foster adequately an ongoing relationship between the child and the noncustodial parent.

"*White v. White, supra,* 437 Pa. Super. at 451, 650 A.2d at 113, quoting *Gruber v. Gruber, supra,* 400 Pa. Super. at 184-85, 583 A.2d at 439. The factors to be considered are refinements of the basic standard which remains the

best interest of the child. *Lee v. Fontine,* 406 Pa. Super. 487, 594 A.2d 724 (1991); see also, *Pa. Family Law Prac. and Proc., supra.* Moreover, the fact that considerable distance will increase the cost and logistical problems of maintaining contact between the child and the noncustodial parent does not necessarily preclude relocation when other factors militate in favor of it. *Id.*" *Gancas v. Schultz,* 453 Pa. Super. 324, 331, 683 A.2d 1207, 1210 (1996).

It does appear that Poh's decision to relocate to Florida will improve the quality of her life and the lives of her children. Her purpose for moving is to live with, and eventually marry, Frankie Sanders. She attempted to convince Sanders to move to Pennsylvania, but Sanders, for appropriate career and family reasons, determined that he had no desire to reside in Pennsylvania. Poh and Sanders appear committed to each other and Sanders appears to be an appropriate father figure for Poh's children. For Poh to remain in Pennsylvania, she would have had to end her relationship with Sanders. Further, Poh's mother and sister independently moved to Florida, resulting in her familial ties being stronger in Florida than in Pennsylvania. Also, her career opportunities have improved somewhat by her move to Florida.

Secondly, the decision to relocate is not based on a whim on her part, or as a method to prevent Hanley from having a relationship with Sean. The issue of relocation came up after commencement of these proceedings and appear properly motivated, for reasons already set forth.

Finally, Poh has stated that she would agree to Sean having extensive time with Hanley during the summer months. In any case, where there is relocation involving a great distance between the parties, a constant interaction between the child and the noncustodial party is go-

ing to be limited. Generally, this results in the noncustodial party having time with the child when the child is available, when not attending school during the summer months. As the court in *Gruber* notes, "The necessity of shifting visitation arrangements to account for geographical distances will not defeat a move which has been shown to offer real advantages to the custodial parent and the children." *Gruber,* 400 Pa. Super. at 185-86, 583 A.2d at 439.

We turn then to the pivotal issue of this case, namely, whether Hanley has provided sufficient evidence to overcome Poh's prima facie right to custody.

Hanley's presentation consists of her track record in parenting Sean with Fagley, the stability and continuity that has developed in Sean's life through this parenting, and the strong recommendation made on her behalf by the psychologist, Mr. Horney.

Indeed, through Hanley and Fagley, Sean has received superior care. The couple[3] provided for Sean as their own in every regard and developed a tremendous love and maternal responsibility toward Sean. They did not care for Sean merely to assist Poh through her difficulties, but welcomed Sean as part of their family. In fact, both Hanley and Fagley themselves considered Sean to be part of their family, objecting to Poh's decision to take over custody of Sean when she planned to move to Schuylkill

---

3. The fact that Hanley and Fagley were involved in a lesbian relationship was not raised by Poh for this court to consider as a factor in determining custody. If Poh had raised the issue, this court would have considered her doing so to be disingenuous, considering that it was she who placed Sean into Fagley's care and permitted him to remain there for an extended time. Accordingly, the relationship was not considered a factor in this court's determination.

County. Secondly, their methods in rearing Sean were beyond reproach, as amply demonstrated in the record, and through Sean's development into a responsible young man. Third, until the litigation commenced, resulting in the parties becoming adversarial, Hanley and Fagley always acted appropriately regarding Poh's interaction with Sean, permitting Poh unlimited and unconditional access to Sean, and always recognizing Poh's status as the natural parent.

To the extent Sean had stability in his life, this was also provided through Hanley and Fagley. Poh's financial and personal status was volatile, although steadily improving over the years. Only recently has she acquired reasonable stability through her relationship with Frankie Sanders and the move to Florida. Hanley and Fagley, on the other hand, were always a constant in Sean's life, at least until the unfortunate death of Fagley. Hanley even relocated to Exeter Township to enable Sean to continue attending the Exeter School District.

Third, Mr. Horney unequivocally supports Hanley's position. Horney opines that based upon the history of all interested parties, his interviews and his testing, that Hanley is clearly a superior parent to Poh. Further, he believes that Poh is oblivious to Sean's needs and circumstances. She failed to invest in Sean's educational or medical needs, and minimized Sean's psychological issues. In essence, Horney concludes that Poh has been an absentee parent, with Hanley and Fagley rescuing Sean by assuming Poh's responsibilities. He sees no reason to transfer custody when Sean has thrived under Hanley and Fagley's care, and because it would mean a transfer from, in essence, a superior parent to an inferior one.

There are, however, several counterbalances to Hanley's argument. First, while it is apparent that a comparison of Poh's parenting of Sean to date cannot match Hanley's and Fagley's either qualitatively or quantitatively, there is no evidence to suggest that Poh was or is an unfit parent. As primary custodian of her other two children, she appears quite capable of providing appropriate parenting.

Secondly, it must be noted that Fagley became involved because Poh was in a desperate situation, as a single mother with three young children, without help from the children's father, and with no job prospects. Seeking and accepting Fagley's help appeared to be the best decision for Sean that Poh could make, helping her to avoid the possibility of adoption of one or more of the children, accepting welfare, or attempting to quickly find a "husband" to bail her out. She accepted Fagley's help, as well as the help of other friends, to care for her children. Meanwhile, she worked hard to establish herself, eventually acquiring a career which provided financial stability. She is a survivor. Clearly, she should have taken back custody of Sean well before she advised Fagley of her plan to move to Schuylkill County, but in light of Fagley's optimal care, and the continuing demands on Poh's schedule, she continued to allow Sean to remain with Fagley and Hanley out of convenience and comfort. At no time did she relinquish legal custody of Sean, nor did she even contemplate either abandoning Sean, or transferring custody to Fagley or Hanley. When it became apparent to her that Fagley and Hanley sought to retain custody of Sean, she steadfastly opposed this, weathering the instant protracted litigation and costs thereof. She has now achieved apparent stability, in both

her career and her family life. She is, and has been, ready and able to assume her parental duties toward Sean.

Another fact that must be considered is the ramifications of separating Sean from his siblings through an award of custody to Hanley. Sean's brother and sister, who appear to be very close to Sean, now live in Florida. An award of primary custody to Hanley would greatly compromise these relationships.[4]

Additionally, Poh's commitment to Frankie Sanders means that, for the first time in Sean's life, an appropriate father figure is available for him. While Sanders has had limited access to Sean to date, he has developed a good relationship with Poh's other two children. As a baseball instructor for children, he appears to have a capacity for parenting and bonding with children. Sean has a strong interest in sports, which would provide a good starting point for developing a close relationship. As a 13-year-old, Sean is entering into a period of his life where having a father figure present to model himself after, and rely upon, is crucial to his continuing development. Further, Sanders is African American, as is Sean. For the first time, Sean would have an adult in his life who can offer him exposure to African American culture.

We are also mindful that Sean has never been given the opportunity to reside with his family. Mr. Horney states, "It is important for Sean to establish his biological identity with his mother and family." It is likely that

---

4. Absent compelling reasons, children should be raised together in one household, which permits continuity and stability necessary for a child's development. *Ferdinand v. Ferdinand,* 763 A.2d 820 (Pa. Super. 2000).

Sean's anxieties stem at least in part from the fact that he has never felt "included" with his family, never treated the same as his brother and sister.

Another factor is the unlikelihood that the stability accomplished for Sean through the efforts of Hanley and Fagley can be recaptured. For several years, Sean's world consisted of Fagley and Hanley providing for his care, seeing his mother on a partial custody basis. The parties all got along together and there was an expectation, though perhaps unstated, that Sean would eventually reside with his mother once she got her affairs in order. That changed with the advent of the litigation and the concurrent death of Fagley. Since the suit started, Hanley and Poh have been adversarial, with Sean feeling increasing pressure from being caught in the middle. Fagley's death was devastating to Sean. Additionally, Sean's mother and siblings are now living in Florida. Thus, while an award of primary custody to Hanley would result in continuity of parenting and schooling, in several other regards such an award would not shield Sean from change and upheaval.

After balancing all the factors involved, and recognizing that the evidentiary scales are tipped hard in favor of Poh, this court finds that Poh should be awarded primary custody, with Hanley to have time during the summer months. While this means that Sean would leave one of the persons who had primary custody of him for an extended period of time, and would also require him to move to Florida, this court does not consider this an "uprooting" of Sean. Sean has expressed being equally comfortable with either party. The move will enable him to reside with his siblings. As Sean moves into adolescence, his changing needs will best be addressed by an

intact family, with a father figure such as Sanders. While, as Mr. Horney set forth, Poh does not have as close a relationship to Sean as does Hanley, both Poh and Sean desire to improve this bond. There is no reason why this cannot be accomplished now that Sean will be residing with his mother, and she will be able to attend to him on a daily basis.

Hanley and Fagley must be credited with being available for Sean when he most needed them. The court recognizes that Hanley has done everything in her power to continue to provide a good home for Sean and has established herself as a superior parent. Nevertheless, there are things she simply cannot provide, the most important being the fulfillment of Sean's need to be included as part of "his" family. As the Pennsylvania Supreme Court in *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980), stated:

"where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents.

"[o]ur determination today is only an appropriate recognition that the blood relationship of parenthood has traditionally served and continues to serve as our society's fundamental criterion for allocating control over and responsibility for our children, and that without some showing of harm, the courts should not interfere with that arrangement." 490 Pa. at 369, 416 A.2d at 514-15.

Accordingly, we enter the following order and respectfully request the Pennsylvania Supreme Court vacate the supersedeas entered in this case:

## ORDER

And now, July 20, 2005, after trial held, this court determines that custody of the minor child, Sean Alexander Mayo, born February 15, 1992, shall be as follows:

(1) Defendant, Heather M. Poh, shall have legal custody and primary physical custody of the minor child.

(2) Plaintiff, Joan M. Hanley, shall have partial custody as follows:

(A) For six consecutive weeks each summer, the dates to be agreed upon by the parties;

(B) For one week during the school year, the time to be agreed upon by the parties; and

(C) At such other times as the parties may mutually agree, including any such time as plaintiff visits the State of Florida.

(3) If the parties cannot agree on the partial custody schedule, plaintiff's schedule shall take priority in odd numbered years and defendant's schedule shall take priority in even numbered years.

(4) Plaintiff may contact the minor child on a regular basis by telephone contact, e-mail or correspondence to his address.

(5) Defendant, Heather M. Poh, and the minor child shall engage in counseling, the counselor to be chosen by defendant and the costs to be borne by defendant. The counselor shall address any of Sean's needs, including, but not limited to, his obsessive/compulsive disorder, his grieving over the death of Deborah Fagley, the stress suffered by him stemming from the protracted custody litigation, and his reunion with his family. Coun-

seling shall continue until the counselor no longer deems it appropriate, or upon further order of court.

(6) The attached appendix shall be made a part of this order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party

shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the children/child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.